THOMAS J. POPE, DEFENDANT IN ERROR, v. JOHN W. FERGUSON, PLAINTIFF IN ERROR.

Submitted December 11, 1911—Decided April 19, 1912.

1. To constitute an estoppel *in pais* the party against whom it is sought to be enforced must have made some representation, either by act or word, the normal effect of which would be to influence

the conduct of the person who seeks to enforce the estoppel and which induces him to so change his position as to materially injure him if the party making the representation is allowed to deny its truth.

2. A statement in a contract for the sale of goods specifying the amount thereof is, ordinarily, an implied warranty on the part of the seller of the quantity which the buyer is entitled to receive.

3. The common law rule, prevailing in actions by the buyer against the seller for the breach of an executory contract for the sale of goods, is that he cannot recover for anticipated profits to be made by him on a sub-contract for the resale of the goods unless such sub-contract is in existence at the time when the original contract is entered into, and is made known to the seller; and this rule has not been at all modified by the sixty-seventh section of our act codifying the law relating to the sales of personal property.

On error to the Supreme Court.

For the plaintiff in error, *Randolph Perkins.*

For the defendant in error, *Brinkerhoff & Fielder.*

The opinion of the court was delivered by

GUMMERE, CHIEF JUSTICE. The plaintiff and defendant, on the 4th day of December, 1908, entered into the following contract for the purchase and sale of old iron ship plates:

"Sold For:   F. Ferguson & Sons, Hoboken, N. J.

To the Order of:   Thos. J. Pope.

Quantity:   700 to 800 tons.

Description:   Old iron ship plates, approximately 6 ft. long by 30 to 36″ wide, 3/8″ thick and over, same to be all the iron plate taken off the steam boat 'New York' now being dismantled at Newburgh, N. Y.

Price:   Fourteen Dollars and Fifteen cents per gross ton of 2240 lbs. Delivered free f o b cars or lighter at Buyers' Option Newburgh, N. Y.

Terms:   Cash against shipping documents, showing gross and net weight and tare of each car, same to be accurately determined.

How Sold: Delivery to be made as follows: 70 tons
   promptly balance as conditions permit, (weather and
   ice). Delivery of all to be completed by June 30th,
   1909.
accepted (Signed) John Ferguson.
      Seller   Dec. 4, 1908.
                              accepted
                              (Signed) Thomas J. Pope.
                              Buyer."

Some days after the making of this contract the plaintiff
accepted an offer from the firm of B. Nicoll & Co., to pur-
chase from him so many of these plates as should be reason-
ably flat. The offer and acceptance were in writing, and
are as follows: "Dec. 11, 1909.  Mr. Thomas J. Pope, 59
Beekman Street, City.  Dear Sir:—We will pay you Two
Dollars ($2.00) per gross ton for every ton of iron ship plate
delivered either on lighter or f.o.b. cars Newburgh, providing
the plates are reasonably flat. . This material is to be de-
livered to our order by F. Ferguson & Sons, who are dis-
mantling the steamboat 'New York.' In addition to the
above $2.00 per gross ton, we are to pay Mr. Ferguson's
bills which will be rendered on $14.10 per gross ton basis.
We will advance you Five Hundred ($500.00) Dollars on ac-
count of this purchase, with the distinct understanding that
if there is not sufficient tonnage delivered to us to more than
offset this $500.00 advanced; i. e., 250 tons or more, you
are to refund to us at the rate of $2.00 per ton for such
shortage. Yours very truly, (Signed) B. Nicoll & Co.  I
hereby acknowledge receipt from B. Nicoll & Company the
$500.00 mentioned above in this letter, and agree to its terms.
(Signed) Thomas J. Pope, Dec. 11th, 1908."

On the same day that the transaction with B. Nicoll &
Co. was closed the plaintiff wrote the defendant stating, "I
have sold to B. Nicoll & Company all of the iron plate which
is to come from the steamboat 'New York' which you are
wrecking, and you will oblige me greatly if you will make
all bills of lading covering this material out to their order."

After the notification the defendant proceeded to make shipments directly to B. Nicoll & Co. of such plates as were taken from the vessel. The total amount shipped by him was thirty-five tons, the last shipment being made December 17th, 1908, and this suit is brought by the plaintiff to recover the loss sustained by him through the failure of the defendant to ship the rest of the iron plates called for by his contract. The trial resulted in a verdict in favor of the plaintiff for $1,375.09.

The first and second assignments of error are directed at the refusal of the trial court to order a nonsuit at the defendant's request, and its refusal of defendant's motion that a verdict be directed in his favor. The ground of each of these applications was that there had been an absolute assignment by the plaintiff of his contract with the defendant to B. Nicoll & Co., and that, consequently, any right of action which had resulted from the breach of the contract by the defendant was in B. Nicoll & Co., and not in the plaintiff.

The agreement between the plaintiff and B. Nicoll & Co., which has already been recited, did not constitute an assignment of the defendant's contract with the plaintiff, but was a resale to B. Nicoll & Co. of the plates purchased by the plaintiff from the defendant. No other agreement with relation to the subject-matter of the defendant's contract was entered into between the plaintiff and B. Nicoll & Co. The contention of the defendant, therefore, was unsupported by the fact. He insisted, however, that plaintiff was estopped from denying that there was such an assignment, because of a letter written by him to the defendant on April 12th, 1909, in which he stated that he had "assigned, transferred and set over to the firm of B. Nicoll & Co." the original contract, and because of a conversation between himself and the plaintiff in the latter part of March, 1909, in which a similar statement was made by the plaintiff. But each of these statements was made some months after the last of the defendant's deliveries, and did not at all influence him in his subsequent conduct with relation to the subject-matter of his contract. To constitute an estoppel *in pais* the party against whom it

is sought to be enforced must have made some representation, either by act or word, the normal effect of which would be to influence the conduct of the person who seeks to enforce the estoppel, and which induces him to so change his position as to materially injure him if the party making the representation is allowed to deny its truth. *Phillipsburg Bank* v. *Fulmer,* 2 *Vroom* 55; *Dewees* v. *Manhattan Ins. Co.,* 6 *Id.* 376; *Mutual Life Insurance Co.* v. *Norris,* 4 *Stew. Eq.* 585; *Hart* v. *Kennedy,* 2 *Dick. Ch. Rep.* 61. The trial court, therefore, correctly disposed of the motion to nonsuit and the request to direct a verdict for the defendant.

From what has been said in disposing of the assignments of error just discussed it necessarily follows that the instruction of the court to the jury to the effect that the claim of the defendant that his contract with the plaintiff had been assigned to B. Nicoll & Co., was unsupported by the proofs in the case, and that the plaintiff was not estopped from showing that it had not, in fact, been so assigned, which is also made the subject of an assignment of error, was entirely proper.

It is further contended that there was error in the instruction of the court to the jury as to the damages which the plaintiff was entitled to recover. The instruction complained of was as follows: "The evidence in this case is that the profit to the plaintiff was $2 a ton, which was the difference between the amount which the plaintiff was to pay the defendant, and the amount which he was to receive from B. Nicoll & Co., to whom he sold the iron in New York. The failure of the defendant in this case to furnish the iron to him, or to anybody else, of course has prevented him from filling his contract with the party in New York, consequently his damages would be $2 a ton for the amount of iron not delivered. The minimum amount being 700 tons, and 35 tons of it having been delivered, leaves 665 tons for which the plaintiff would be entitled to his profit at $2 a ton." It is insisted that this instruction is erroneous in two respects— *first,* because it assumes that the amount of iron which the defendant was obligated to deliver was at least seven hundred

tons, without regard to the actual amount which might be salved from the vessel; and *second,* because the true measure of damages was the difference between the price contracted for between the plaintiff and defendant and the market price of the material sold at the time of the breach of the contract.

So far as the first point is concerned we consider the instruction proper. The statement in the contract that the quantity of iron plates was seven hundred to eight hundred tons, was a material part of the agreement, an implied warranty by the defendant that the vessel would produce at least the minimum amount specified; and he could not, therefore, have excused himself from delivering this minimum amount, even if the vessel had not in fact produced that quantity.

I turn now to the consideration of the second criticism upon the instruction. It is to be observed that since the codification of the law relating to sales of personal property by the act of May 7th, 1907 (*Pamph. L., p.* 311), the remedies of the buyer are controlled by that act. In cases where the property in the goods has not passed to the buyer, and the seller wrongfully neglects or refuses to deliver the goods, section 67 of the act provides that "Where there is an available market for the goods in question the measure of damages, in the absence of special circumstances showing proximate damages of a greater amount, is the difference between the contract price and the market or current price of the goods at the time or times when they ought to have been delivered, or, if no time was fixed, then at the time of the refusal to deliver." In the present case it appeared by uncontroverted evidence that the market price of the same kind of material which was the subject-matter of the contract had gone up after the contract was made, and that about the time of the breach complained of it was selling at from $14.65 to $15 per ton. The amount of the damages, therefore, which the plaintiff was entitled to recover was the difference between the contract price and the market or current price of the ship plates at the time when they ought to have been delivered, unless the making of the sub-contract for their sale by the plaintiff to B. Nicoll & Co. was such a "special

circumstance" as to take the case out of the general rule of the statute.

The primary purpose of the codification as expressed in its title was to make uniform the law concerning the sale of goods. Any construction of the statute, therefore, which would throw it out of harmony with rules of law generally prevailing, relating to that subject, would be in direct violation of its expressed object. It is, consequently, necessary to ascertain whether there is any generally accepted rule existing in other jurisdictions prescribing the measure of damages in actions by the vendee, for failure to deliver the goods, where he has made a contract for the resale thereof.

The underlying principle applicable in the admeasurement of damages in actions for breach of contract where the loss resulting therefrom is enhanced by special circumstances is thus stated by Baron Alderson in the leading case of *Hadley* v. *Baxendale,* 9 *Exch.* 341: "Where two parties have made a contract which one of them has broken the damages which the other party ought to receive in respect of such breach of contract should be such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach of it." And the reason therefore given by the learned Baron is that "If the special circumstances under which the contract was actually made were communicated by the plaintiff to the defendant, and thus known to both parties, the damages resulting from the breach of such a contract which they would reasonably contemplate would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated. But on the other hand, if these special circumstances were wholly unknown to the party breaking the contract, he at most could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases not affected by any special circumstances, from such a breach of contract. For had the special circumstances been known the parties might have specially provided for the breach of con-

tract by special terms as to the damage in that case; and of this advantage it would be very unjust to deprive them." This principle, which is commonly known as the second rule of Hadley *v.* Baxendale, has been universally accepted both in England and this country as a correct exposition of the measure of liability in the class of cases with which it deals. Many of the decisions in which this rule has been applied were rendered in cases which involved breaches of contracts for the sale of goods where the vendor had wrongfully neglected or refused to deliver them to the vendee, and the vendee · had suffered special damage by reason . of his inability to perform a sub-contract of sale made by him with a third person. The English decisions relating to the breach of such contracts are reviewed in *Benj. Sales,* § 1237, and the text-writer deduces from them the following principle: That if at the time of the sale the existence of a sub-contract is not made known to the seller, a knowledge on his part that the buyer is purchasing with a general intention to resell, or notice of a sub-contract, given to him subsequent to the date of the contract, will not render him liable for the buyer's loss of profits on such sub-contract; and an examination of the cases reviewed by him shows the correctness of his deduction.

The same principle is to be deduced from the American decisions, many of which are collated in 24 *Am. & Eng. Encycl. L.* 1155, in support of the text that "The profits which the purchaser could have made by a resale of the property, in case it had been delivered by the seller, are not an element of damages, when the seller at the time of the sale was not informed of such contract for resale, as such profits cannot be considered as within the contemplation of the parties at the time of sale." In 35 *Cyc.* 465, the result of the many American decisions there cited is thus summed up by Professor Cooley in his article on sales: "It is generally conceded that the buyer cannot recover the profits on a special contract of resale unless the existence of such contract was disclosed to the seller. If, however, the seller knows that the purchaser has existing contracts for resale, and the con-

tract is made in contemplation of such resale, the buyer may recover as damages the profits or losses by reason of the breach. There can be no recovery of profits on special contracts of resale made after the contract of purchase." This being the state of the law at the time of the codification of the law of sales by our legislature, and the purpose of that codification being to make uniform the law relating thereto, we are entirely clear that it was not the intention of the legislature to except from the general rule of damages declared in the sixty-seventh section of the act cases in which, after the making of a contract for the sale of goods, the buyer has made a contract for the resale thereof.

We conclude, therefore, that the criticism of the plaintiff in error upon that part of the charge now under consideration is well founded; and that the true measure of damages was the difference between the contract price and the market or current price of the goods contracted for at the time when they should have been delivered.

The other assignments relied on by the plaintiff in error are based upon rulings of the trial court on matters of evidence. We have examined them but do not consider them of sufficient importance to justify discussion. We find them to be without merit. As the case must go back for a retrial we make this brief reference to them.

For error in the charge the judgment under review must be reversed, and a *venire de novo* awarded.

GARRISON, J. (concurring). I concur in the reversal of this judgment upon the ground that the measure of damages was the difference between the contract price and the market price, as stated in the opinion of the Chief Justice.

I do not concur in the view that there was a warranty that seven hundred tons at least would be produced from the wreck. The circumstances in view of which the agreement was made show that nothing more than an estimate could have been made or have been understood as being made; the wide margin, viz., "700 to 800 tons," is in accord with this view, as also is the definite statement that follows such estimate,

viz., that what is sold is "all the iron plate taken off the steam boat New York now being dismantled at Newburgh, N. Y.," where she lay sunk under the waters of the river. A definite statement of the subject of sale should prevail over what is evidently an attempted estimate, just as a fixed monument prevails over a course that runs so many links and chains, more or less. I am unable to spell a warranty out of the undertaking expressed in the written memorandum in this case.

The $2 a ton profit in the resale to Nicoll & Co. was clearly not a legal measure of damage, not only for the fundamental reason given by the Chief Justice, but also because such price was agreed to be paid for such plates only as were reasonably flat, and hence could not without specific proof be extended to cover the whole subject of such resale. I am requested by Justices Parker, Bergen and Voorhees to say that they concur in the foregoing views.

*For affirmance*—None.

*For reversal*—THE CHIEF JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, VOORHEES, MINTURN, KALISCH, BOGERT, VREDENBURGH, VROOM, CONGDON, WHITE, TREACY. JJ. 15.